Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CABLEVISION SYSTEMS NEW YORK CITY CORPORATION, Plaintiff,
v.
Catherine COLLINS, Defendant.
No. 01 Civ.10954 RO FM.
June 29, 2004.

*REPORT AND RECOMMENDATION TO THE HONORABLE RICHARD OWEN*[FN*]

[FN*] This Report and Recommendation was prepared with the assistance of Heather Burke, a first-year student at Fordham Law School.

MAAS, Magistrate J.

## I. *Introduction*

*1* In this action, plaintiff Cablevision Systems New York ("Cablevision") alleges that defendant Catherine Collins ("Collins") violated the Cable Communications Policy Act, as amended, 47 U.S.C. §§ 605(a) and 553(a)(1), by tampering with Cablevision's television system in order to receive its private telecommunications signals unlawfully through use of a "pirate" converter device. After Collins failed to answer the complaint, Your Honor entered a default judgment and referred the matter to me to conduct an inquest regarding Cablevision's damages. ( *See*Docket No. 4).

On August 27, 2002, I directed Cablevision to serve and file an inquest memorandum by September 4, 2002, setting forth its proof of damages, as well as its proposed findings of fact and conclusions of law. The scheduling order gave Collins until September 18, 2002, to respond. Although Cablevision's papers were timely filed, Collins has neither filed any opposition papers, nor had any contact with this Court.

As detailed below, I recommend that Cablevision be awarded a total of $10,690, consisting of statutory damages in the amount of $10,000 plus reasonable attorneys' fees and costs in the amount of $690.

## II. *Standard of Review*

In light of Collins' default, Cablevision's well-pleaded allegations concerning issues other than damages must be accepted as true. *See Cotton v. Slone, 4 F.3d 176, 181 (2d Cir.1993); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir.1992); Time Warner Cable of New York City v. Barnes, 13 F.Supp.2d 543, 547 (S.D.N.Y.1998); Cablevision Sys. New York City Corp. v. Lokshin, 980 F.Supp. 107, 111 (E.D.N.Y.1997).*

Additionally, although a plaintiff seeking to recover damages against a defaulting defendant must prove its claim through the submission of evidence, the Court need not hold a hearing as long as (i) it has determined the proper rule for calculating damages, *see Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir.1999),* and (ii) the plaintiff's evidence establishes, with reasonable certainty, the basis for the damages specified in the default judgment. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir.1997); Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir.1989); see also Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53-54 (2d Cir.1993)* (inquest on damages without hearing improper where based upon "single affidavit only partially based upon real numbers").

III. *Factual Findings*

On the basis of the complaint and Cablevision's inquest papers, I find as follows: Cablevision is a division of CSC Holdings, Inc., a Delaware corporation, authorized to conduct business in New York, which maintains its principal office at 1111 Stewart Avenue, Bethpage, New York. (Compl.¶ 4).

Collins, at all relevant times, resided at 2440 Boston Road, Apt. 17K, Bronx, New York. ( *Id.* ¶ 4; Aff. of Charles Carroll, sworn to on Aug. 28, 2002 ("Carroll Aff."), ¶ 18).

**\*2** Pursuant to government franchises, Cablevision constructs, operates and maintains cable television systems in parts of Bronx County as well as other counties. (Compl.¶ 6). Cablevision offers its customers various tiers of programming services including "Basic," "Family," and "Optimum" which a subscriber may purchase for a monthly fee. ( *Id.* ¶ 7). "Basic" service provides a subscriber with broadcast stations as well as a small number of additional programming services. (Carroll Aff. ¶ 3). "Family" service is a higher level of programming that includes all of Cablevision's services with the exception of "premium" and pay-per-view programming. ( *Id.*). "Optimum" service provides all programming available under "Family" service and premium stations. ( *Id.*). A subscriber may pay for premium services at a higher monthly rate, or may choose to purchase pay-per-view programming for a pay-per-event fee in addition to the regular monthly fee. ( *Id.* ¶¶ 4-5). Premium services include channels such as HBO, Cinemax and Showtime, and range in price from approximately $1.95 to $14.95 per month, while packages of premium services range in cost between $40.75 and $80.95. ( *Id.* ¶ 4). Pay-per-view programming is offered continuously throughout a 24-hour period and consists of individual movies and sporting events. ( *Id.* ¶ 5). The pay-per-view items typically cost a subscriber between approximately $4.50 and $49.95 per selection. ( *Id.*). Over the course of a typical month, the aggregate value of Cablevision's pay-per-view programs, assuming each is viewed once, is hundreds of dollars. ( *Id.*).

Satellites transmit the signals for Cablevision's cable television services to Cablevision's reception facilities. (Compl.¶ 10). Those signals then are retransmitted to subscriber's homes and businesses through a network of cable wiring and equipment. ( *Id.*).

Each subscriber is entitled to receive only the level of programming and services that the subscriber has specifically selected and purchased. (Carroll Aff. ¶ 7). The signals of that specific programming are encoded or "scrambled" to prevent subscribers from receiving programming for which they have not paid. ( *Id.* ¶ 9). Cablevision provides each subscriber with a converter-decoder box which is programmed by Cablevision to decode only the services and programs that the subscriber has purchased. ( *Id.* ¶¶ 8, 10). Scrambled programming which has not been purchased remains distorted and unviewable. ( *Id.*).

Despite this scrambling technology, a pirate converter-decoder can "descramble" Cablevision's signals so that the programming can be seen without paying first. (Compl.¶ 14). After commencing an action against Mega Electronics ("Mega") for the sale and distribution of such pirate converter-decoder devices, Cablevision obtained records regarding the sale and shipment of Mega's devices to purchasers across the country. (Carroll Aff. ¶¶ 15-17). The records show that, on July 21, 1999, Collins purchased two pirate converter-decoders from Mega. ( *Id.* ¶ 19 & Ex. C). The decoders purchased by Collins can be used to defeat the encryption technology used by Cablevision in the Bronx. ( *Id.* ¶ 20).

**\*3** Collins first subscribed to Cablevision's services on January 10, 1997. ( *Id.* ¶ 18). In August 1999, one month after purchasing the pirate Mega converters, Collins downgraded her services from "Optimum Gold" to "Family" level. ( *Id.* ¶ 18). In March 2001, Collins added HBO, which she later removed in August 2001. Collins upgraded her service to the "Optimum" level in October 2001, but later downgraded to the "Family" level in January 2002. ( *Id.*). At the time of the default judgment, Collins subscribed to the "Family" level of service at a cost of $35 per month. ( *Id* .).

For the foregoing services Collins paid Cablevision approximately $35 per month from August 1999 to March 2001 (approximately 19 months), $46.95 per month from March

2001 to August 2001 (approximately 5 months),[FN1] $35 per month from August 2001 to October 2001 (approximately 2 months), $80 per month from October 2001 to January 2002 (approximately 3 months) [FN2] and $35 per month from January 2002 to July 2002 (approximately 6 months). Therefore, after her purchase of the pirate boxes through the date of the default judgment, Collins paid Cablevision a total of $1,419.75 (($35 x 27 months) + ($46.95 x 5 months) + ($80 x 3 months)).

FN1. Cablevision offered premium services such as HBO at an average price of $11.95 for each premium channel. (Carroll Aff. ¶ 24). I have accordingly assumed that her monthly bill during this period was $46.95 ($35 + $11.95).

FN2. Cablevision's papers do not indicate the cost of an "Optimum" level of service. However, the price of "Family" service plus all premium services is approximately $80 per month. (Carroll Aff. ¶ 24).


IV. *Discussion*


A. *Statutory Damages*

Sections 553 and 605 of Title 47 of the United States Code prohibit the unauthorized interception and reception of cable programming services. [FN3] *Barnes,* 13 F.Supp.2d at 547-48 (citing *Int'l Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir.1996)); *Lokshin,* 980 F.Supp. at 112 ("In contrast to Section 553, which by its statutory language applies only to transmissions via cable systems, Section 605(a) applies to the 'interception of cable-borne, as well as over-the-air, pay television' where cable-borne transmissions originate as satellite transmissions···· Thus, when pay television programming is transmitted over both cable and satellite mediums, both statutes apply." (quoting *Sykes,* 75 F.3d at 130)).

FN3. Section 553(a)(1) provides, in part, that:

No person shall intercept or receive ··· any communications service offered over a cable system unless specifically authorized to do so by a cable operator or as may otherwise specifically authorized by law.

Section 605(a) provides, in part, that:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person.

When a court determines that a defendant has violated both Sections 553 and 605, the aggrieved cable operator may recover damages under only one of those sections. *Sykes,* 75 F.3d at 127; *Barnes,* 13 F.Supp.2d. at 548; *American Cablevision of Queens v. McGinn,* 817 F.Supp. 317, 320 (E.D.N.Y.1993). A plaintiff may, however, elect to recover damages under Section 605 in consideration of its higher damages award. *Sykes,* 75 F.3d at 127; *Barnes,* 13 F.Supp.2d at 548.

In this case, Collins purchased two descrambling devices capable of intercepting and receiving encrypted Cablevision signals. Moreover, it is apparent that she used them since she lowered her level of Cablevision service shortly after the purchase. Cablevision holds proprietary rights in the transmissions that Collins has intercepted and, therefore, is a "person aggrieved" within the meaning of 47 U.S.C. §§ 553(c)(1) and 605(e)(3)(A). *\*4* Cablevision has elected to recover statutory damages under Section 605. (Carroll Aff. ¶ 29). Section 605(e)(C)(3)(ii) provides that the aggrieved party may recover no less than $1,000 and no more than $10,000 for each violation "as the court considers just."

Not surprisingly, Cablevision seeks to recover the statutory maximum with respect to each Mega device, for a total of $20,000. ( *Id.*).

Because the statute offers little guidance as to how to calculate damages, courts in this circuit have adopted two approaches to assessing damages in cases of unauthorized descrambling of signals by residential subscribers.

One approach has been to assess damages based on the difference between the amount of service for which defendants paid monthly and the amount their unauthorized use enabled them to receive over the course of their misconduct. *See Lokshin,* 980 F.Supp. at 113 (finding award of $125 per month for pilfered pay-per-view services to be reasonable); *McGinn,* 817 F.Supp. at 320 (imposing statutory damages of $250 per month per unauthorized decoder); *Time Warner Cable of N.Y. v. Rivera,* No. 94 Civ. 2339, 1995 WL 362429, at *4 (E.D.N.Y. June 8, 1995) (Report & Rec. of Mag. J. Gold) (recommending approximately $1,000 in damages for eight months of pay-per-view programming); *Time Warner Cable of N.Y. v. Fland,* No. 97 Civ. 7197, 1999 WL 1489144, at *4 (S.D.N.Y. Dec. 3, 1999) (Report & Rec. of Mag. J. Grubin) ($71.55 per month in unpaid premium services and $225 per month in pay-per-view services); *Cablevision Sys. New York City Corp. v. Santiago,* No. 02 Civ. 322, 2003 WL 1882254, at *5-*6 (S.D.N.Y. Mar. 17, 2003) (Report & Rec. of Mag. J. Freeman) ($45 per month in unpaid premium services and $110 per month in pay-per-view services). Other courts have awarded a flat sum based only on the court's determination of the appropriate damages given the circumstances of the case. *Barnes,* 13 F.Supp.2d at 548 (awarding a $1,000 flat sum); *Time Warner Cable of N.Y.C. v. Domsky,* No. 96 Civ. 6851, 1997 WL 33374593, at *6-*7 (S.D.N.Y. Sept. 2, 1997) ($1,000 in statutory damages per violation).

Although Collins' failure to submit any evidence makes it impossible to determine the actual period during which Collins was using at least one of her pirate decoders, it is reasonable to assume that she began using them within one month after her purchase when she downgraded her level of cable service. In the absence of any showing to the contrary, it is also reasonable to assume that she continued to use the pirate devices through the date of the default judgment, despite the various changes in her level of service. During that 35-month period the cost of obtaining all of Cablevision's premium services was approximately $80 per month. (Carroll Aff. ¶ 24). Collins would therefore have likely paid $2,800 ($80 x 35 months) for such services had she not used the unauthorized devices. During that period, however, Collins paid Cablevision only $1,419.75. Thus, if one assumes that Collins used her decoder boxes in this fashion, Cablevision's loss due to her unauthorized access of all its premium programming other than pay-per-view is approximately $1,380.25 ($2,800-$1,419.75).

*\*5* Estimating the amount of unauthorized pay-per-view programming which Collins received is somewhat more difficult. Cablevision claims that the aggregate value of each individual pay-per-view program offered over a typical month, is hundreds of dollars. (Carroll Aff. ¶ 5). Other courts in similar circumstances have estimated the revenue that a cable operator lost with respect to pay-per-view programming, based upon a reasonable assumption as to the number of high-cost and low-cost events the defendant likely watched each month. *See, e.g., Lokshin,* 980 F.Supp. at 113 ($125 in pay-per-view services per month based on an estimate of 16 selections priced at $5 each and four selections at an average cost of $11.25); *see also Fland,* 1999 WL 1489144, at *4 (estimating $225 in pay-per-view services each month without explaining the breakdown of that estimate). Consistent with these decisions, it is reasonable to assume that Collins would not have purchased each pay-per-view program every time it was shown, but, rather, would have watched at least three minimum-cost events per month plus one maximum-cost event. This would have resulted in an additional loss to Cablevision of $63.45 per month (($4.50 x 3) + $49.95) or $2,220.75 from August 1999 to July 2002 ($63.45 x 35 months).

The overall loss to Cablevision due to Collins' unauthorized access, is therefore approximately $3,601 ($1380.25 + $2220.75). However, as Magistrate Judge Ellis noted in *Domsky,* 1997 WL 33374593, at *6, awarding damages simply for the value of the services stolen by a defendant "would not be sufficient deterrence" since the penalty

would merely be "the amount that should have been paid." Accordingly, it is appropriate to double the monthly damages for each month that Collins was likely using her illegal decoders. *Cablevision Sys. N.Y.C. Corp. v. Sencion,* No. 01 Civ. 7069, 2001 WL 1586685, at *3 (S.D.N.Y. Dec. 12, 2001) (Stein, J.); *Domsky,* 1997 WL 33374593, at *6. This would result in an award of statutory damages in the amount of $7,202.

Finally, in this case, Collins purchased two pirate decoders. Due to her default, it is unclear whether Collins used both decoders at her home or gave the second one to another Cablevision subscriber. In these circumstances, it is appropriate to increase the statutory damages awarded, but doubling them seems unduly harsh. Instead, I recommend that the amount of statutory damages be increased to $10,000 (the statutory maximum for one infringing device).

## B. *Attorneys' Fees*

Cablevision also seeks attorneys' fees and costs in the amount of $1,565. ( *See* Affirm, of William, E. Primavera, Esq., dated Aug. 30, 2002 ("Primavera Affirm."), ¶ 13). As the prevailing aggrieved party, Cablevision is entitled to recover reasonable attorneys' fees and costs. 47 U.S.C. § 605(e)(3)(B)(iii). When fixing a reasonable rate for attorneys' fees, courts may consider and apply prevailing market rates "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998) (quoting *Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984)). Moreover, a court may rely on its own knowledge of private firm hourly rates in estimating reasonable attorneys' fees. *Miele v. New York State Teamsters Cong. Pension & Ret. Fund,* 831 F.2d 407, 409 (2d Cir.1987).

*\*6* In the Second Circuit, a party seeking an award of attorneys' fees must support that request with contemporaneous time records that show, "for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir.1983). Attorneys' fees applications that do not contain such supporting data "should normally be disallowed." *Id.* at 1154; *see also Kingvision Pay-Per-View v. The Body Shop,* No. 00 Civ. 1089, 2002 WL 393091, at *5 (S.D.N.Y. Mar. 13, 2002) (Swain, J.) (denying award of attorneys' fees where information regarding how the fees were accumulated was not provided even though requested amount of $1,000 was reasonable).

In prosecuting this action, Cablevision availed itself of the services of William E. Primavera an associate with Lefkowitz, Louis & Sullivan, LLP. Primavera has submitted an affirmation setting forth (a) his professional experience; (b) the professional experience of the paralegals and legal assistants who worked with him; (c) the prearranged fees that Cablevision actually paid his employer for the work performed; and (d) the billing rate at which Cablevision seeks to be compensated. (Primavera Affirm. ¶¶ 2-13). The billing rates for each of the timekeepers seem more than reasonable. Nevertheless, as I have indicated previously, ( *see Cablevision Sys. New York City Corp. v. Diaz,* No. 01 Civ. 4340, 2002 WL 31045855, at *4 (S.D.N.Y. July 10, 2002)), Cablevision is not entitled to be compensated for its lawyer's flat-rate billing.

In this case, Primavera has provided time sheets prepared by the timekeepers who worked on this matter. ( *Id.* Exs. D-H.). Two of the time sheets do not reflect the actual hours expended, ( *see id.* Exs. D, H), and must be disallowed. *See Santiago,* 2003 WL 1882254, at *7 (denying request for attorneys' fees where plaintiff sought legal fees based on flat-rate billing for certain work, but did not provide the number of hours expended).

The time records of the Lefkowitz firm which reflect actual hours expended relate to the work performed by four paralegals, each of whom has an $85 per hour billing rate. Those records indicate that Susan A. Weindler spent 0.3 hours ( *see* Primavera Affirm. ¶ 10 & Ex. F); Alfonso N. Cava spent 0.4 hours ( *see id.* ¶ 11 & Ex. G); Jeanine D. Colavito spent 0.3 hours ( *see id.* ¶ 11 & Ex. H); and Janine P. Zabbia spent 5 hours working on this case. ( *See id.* ¶ 9 & Ex. E). Accordingly, Cablevision is entitled to recover $510 for the legal services rendered by the Lefkowitz firm. ($85 x 6 hours).

C. *Costs*

Cablevision also seeks to recover $180 in costs, consisting of $30 for service of process and the $150 filing fee. This request is reasonable and should be allowed.

IV. *Conclusion*

For the reasons set forth above, I recommend that Cablevision be awarded damages in the amount of $10,690, consisting of $10,000 in statutory damages, $510 for attorneys' fees, and $180 for costs.

V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

*\*7* The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Richard Owen, United States District Judge, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Owen. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U .S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).
S.D.N.Y.,2004.
Cablevision Systems New York City Corp. v. Collins
Not Reported in F.Supp.2d, 2004 WL 1490307 (S.D.N.Y.)


Motions, Pleadings and Filings (Back to top)